ROTHENBERG, J.
 

 The State appeals from a downward departure sentence imposed by the trial court after John Stephen Walters (“the defendant”) entered a guilty plea to one count of organized fraud in the first degree, one count of grand theft in the first degree, and fifty-two counts of money laundering in various degrees. We reverse.
 

 The defendant, through one of his companies, A Auto Insurance Corp., was the seller involved in a December 2002 real estate closing. The defendant’s property, which was in foreclosure, was sold for $2 million, $1,059 million of which was due to Bank One, the holder of an outstanding mortgage. However, as a result of a falsified letter in the closing file, neither Bank One nor its law firm, Butler & Hosch, P.A., was aware of the closing.
 

 Paul Menzel, who knew the defendant, was selected by the defendant as the closing agent. The title insurance company entrusted Menzel with delivering a $997,654.28 check made out to the trust account of the Butler & Hosch law firm, but instead of delivering the check to Butler & Hosch, Menzel delivered the check to the defendant. The defendant is not, and
 
 *300
 
 never was, associated with the Butler
 
 &
 
 Hosch law firm.
 

 On February 3, 2003, the defendant created a Florida corporation named “Butler & Hosch Real Estate Corp.” The defendant then incorporated Butler & Hosch Corp. in Mississippi. The next day, February 7, the defendant opened four new bank accounts at Ocean Bank, one of which was named the “Butler & Hosch Corp. Operating Account.” There, he deposited the stolen $997,654.28. For the next six months, the defendant conducted more than fifty transactions, spending the money for his personal benefit. On August 7, 2003, the defendant transferred the remaining funds, $242,864.34, to one of his other companies’ accounts. The defendant was arrested in December 2005, and taken into custody.
 

 The current victim in this case is Fidelity National Title Insurance Company, Title One (“Fidelity”), which informed the trial court through counsel that obtaining restitution was very important to Fidelity. From 2006 through October 2007, Fidelity, the State, and the defendant engaged in plea discussions. The record before this Court reflects that, for the most part, the negotiations were between the defendant and Fidelity, and focused on the payment of restitution and the defendant’s cooperation in providing information to Fidelity regarding other sums of money Fidelity was attempting to recover.
 

 Despite these discussions, on September 12, 2007, the prosecutor assigned to the case informed the parties and the trial court that the State’s offer was six years in prison. Although defense counsel’s comments were not directed towards the Assistant State Attorney handling the case, he accused the State of negotiating in bad faith, stating that he and his client were led to believe that further incarceration could be avoided and therefore, he had not prepared the case for trial. The Assistant State Attorney advised the trial court that notations in his file made by a previous prosecutor indicated that a six-year sentence was contemplated to close out the case. The trial court reset the case for a status report in thirty days.
 

 On October 12, 2007, the State informed the trial court that negotiations between the State and the defendant had been unsuccessful, it was withdrawing from all negotiations with the defendant, and all previous plea offers had been withdrawn.
 

 At the subsequent hearing conducted on October 16, 2007, over the State’s objection, the defense introduced a series of emails generated by the State, Fidelity, and counsel for the defendant during previous plea discussions. The defendant argued that the facts of the case compelled a downward departure where the scoresheet minimum sentence was 108 years. The State objected to any below guidelines offer. The defendant entered a guilty plea to all counts charged — organized fraud, grand theft, and money laundering. The trial court imposed a downward departure sentence of six months in the county jail (time already served), a $200,000 down payment (made on October 15, 2007), fifteen years’ reporting probation during which the defendant must make quarterly restitution payments of $10,000, and a number of other special conditions. The trial court entered written reasons in support of the departure sentence, and this appeal followed.
 

 A trial court’s determination of whether it could legally depart from the sentencing guidelines will be upheld on appeal if the trial court applied the correct rule of law and competent substantial evidence supports that determination.
 
 State v. Salgado,
 
 948 So.2d 12, 15 (Fla. 3d DCA
 
 *301
 
 2006).
 
 [1]
 
 Here, the trial court provided the following statutory reasons in support of the downward departure sentence: (1) the offense was unsophisticated, isolated, and the defendant showed remorse; and (2) Fidelity’s need for restitution outweighs the need for incarceration. The trial court also based its decision upon its finding that:
 

 It is apparent to the Court that [the defendant], like this Court, reasonably and justifiably relied upon the clear intent of the parties, as well as of the victim, that if a substantial portion of the restitution were raised and paid by the accused, he would not go back to jail.
 

 Because the record does not support the two statutory reasons offered, and the justifiable reliance ground is based on inadmissible evidence, and is factually unsupported, we reverse.
 

 THE FIRST STATUTORY GROUND FOR DEPARTURE
 

 Section 921.0026(2)(j), Florida Statutes (2007), provides that where an offense was committed “in an unsophisticated manner and was an isolated incident for which the defendant has shown remorse,” a downward departure from the sentencing guidelines is justified. This ground for departure is valid only where substantial competent evidence supports all three elements.
 
 Salgado,
 
 948 So.2d at 16. In this case, however, the record is devoid of any evidence in support of a finding that the defendant’s offenses were unsophisticated or isolated.
 

 “[Á] crime is committed in an unsophisticated manner when the acts constituting the crime are ‘artless, simple and not refined.’ ”
 
 Id.
 
 at 17 (quoting
 
 Staffney v. State,
 
 826 So.2d 509, 512-13 (Fla. 4th DCA 2002)). Here, the defendant pled guilty to organized fraud, grand theft, and money laundering — hardly the types of crimes characterized by artless, simple, or unrefined acts. At a minimum, the defendant’s offenses involved: (1) a complicated real estate transaction; (2) the recruitment and complicity of Menzel; (3) a falsified letter that kept Bank One and its representatives unaware of the closing; (4) the formation of a Florida corporation deliberately named to mislead the bank officers/employees called upon to clear the payment; (5) the filing for corporate status of the “Butler & Hosch Corp.” in Mississippi; (6) the opening of four bank accounts named to conceal the defendant’s crimes; (7) the illegal deposit of nearly $1 million into one of the accounts; and (8) the systematic drawing upon the stolen funds from the account while posing as a legitimate account holder. The record reflects that the defendant employed his business knowledge in a series of sophisticated and calculated steps to achieve his criminal ends. Thus, the trial court’s finding that “[t]here was nothing sophisticated about this case” has no support in the record, and borders on the preposterous.
 

 Nor were these acts isolated. The defendant pled guilty to over fifty separate money laundering transactions over the course of more than six months. During that time, the defendant managed to spend over $700,000 of stolen funds for his personal benefit, drawing upon the account of his sham corporation. As a result, the trial court’s characterization of these facts as “essentially ... spending the money [the defendant] and others stole” cannot stand.
 

 
 *302
 
 Accordingly, due to the utter lack of evidentiary support for the trial court’s finding that the defendant’s crimes were unsophisticated and isolated, the trial court’s first reason does not justify the downward departure sentence imposed.
 

 THE SECOND STATUTORY GROUND FOR DEPARTURE
 

 A downward departure sentence is also justified where “[t]he need for payment of restitution to the victim outweighs the need for a prison sentence.” § 921.0026(2)(e), Fla. Stat. (2007). A downward departure based upon this ground requires evidence of the victim’s need, as opposed to a mere preference,
 
 State v. Quintanal,
 
 791 So.2d 23, 24 (Fla. 3d DCA 2001), and the trial court must consider the defendant’s ability to pay, as well as the impact of the plan on the victim.
 
 Demoss v. State,
 
 843 So.2d 309, 312 (Fla. 1st DCA 2003). Because no competent substantial evidence supports the trial court’s finding that Fidelity had a pressing need for restitution, no evidence indicates whether the defendant has the ability to make continued payments pursuant to the schedule, and no evidence reveals whether completion of the restitution payments would significantly affect Fidelity’s interests, under these circumstances, the downward departure ground provided in section 921.0026(2)(e) was improper.
 

 $997,654.28 is an attention-grabbing amount of money. However, where the record does not reflect a pressing need for restitution, a downward departure sentence is not justified, and this Court is compelled to reverse.
 
 State v. Prasad,
 
 889 So.2d 204, 205 (Fla. 4th DCA 2004). Beyond the assertions of Fidelity’s counsel to the effect that restitution was very important, and the defendant’s incarceration was not desired, Fidelity did not show that the extent of the harm suffered as a result of the defendant’s crimes was greater than normally expected, or how restitution would operate to mitigate that harm.
 
 See id.
 
 (noting that a downward departure under section 921.0026(2)(e) requires a greater than normal harm and a showing that restitution could mitigate that harm). The record reflects that Fidelity has fully compensated the original victims in this case, making them whole, and Fidelity’s loss was not proven to be outside the realm of normal expectations. Therefore, Fidelity, a corporation in the business of planning for and managing economic losses, has, at best, expressed its preference for restitution, and a downward departure is not justified.
 
 [2]
 

 In addition, because the record does not contain any evidence of the defendant’s ability to make continuing restitution payments, this downward departure sentence pursuant to section 921.0026(2)(e) must be reversed. In fact, the record evidence requires a finding to the contrary. When the defendant planned and carried out these crimes, his property was in foreclosure, he was in arrears in his child support obligations, he owed money to two different attorneys, and he was otherwise in debt.
 

 The defendant and the trial court make much of the fact that the defendant was able to “raise” $200,000 in a little over a
 
 *303
 
 year to pay towards restitution.
 
 [3]
 
 However, the record does not reveal whether this amount was “raised” out of previously stolen funds, a job, by selling some of the property obtained by use of the stolen proceeds, or through some other income source. Because the record is devoid of any evidence regarding the defendant’s ability to pay the restitution ordered, the trial court’s downward departure sentence pursuant to the second offered ground is not factually justified.
 
 See Demoss,
 
 843 So.2d 309 at 312 (holding that when considering the efficacy of restitution, the trial court must evaluate the defendant’s ability to pay). We also note that the defendant did not testify and that the unsworn statements of counsel do not constitute evidence.
 
 See State v. Champion,
 
 898 So.2d 1111, 1112 (Fla. 2d DCA 2005) (holding that counsel’s unsworn statements cannot support a downward departure).
 

 THE JUSTIFIABLE RELIANCE ISSUE
 

 At the October 16 hearing in this case, the defendant sought to introduce into evidence a series of e-mails exchanged between the State, counsel for the defendant, and Fidelity’s counsel to support his argument that throughout plea discussions, the State led the defendant to believe that no further incarceration was contemplated, and that restitution was the predominant goal of the State at sentencing. The State immediately objected to the introduction of these e-mails, arguing that they were irrelevant, and the State should not be penalized for pursuing plea negotiations prior to sentencing. Over the State’s objection, the trial court allowed the e-mails into evidence. The State argues in this appeal that the introduction of the e-mails was error. We agree.
 

 First, and contrary to the defendant’s argument, even a cursory review of the hearing transcript reflects that the State preserved this issue for appellate review. Second, there is no question as to the inadmissibility of the e-mails, which contained statements from each of the parties regarding proposed sentencing frameworks, counter-proposals, and other concerns. Section 90.410, Florida Statutes (2007), provides that “[ejvidence of statements made in connection with any of the pleas or offers is inadmissible” outside of perjury/false statement prosecutions. While statements of offers made during plea negotiations may be admitted to reveal the bias of a non-party witness,
 
 Cruz v. State,
 
 437 So.2d 692, 695 (Fla. 1st DCA 1983),
 
 disapproved on other grounds by Edwards v. State,
 
 548 So.2d 656 (Fla.1989), the law forbids the introduction of statements made by a party (here, the State) in order to bind that party to a statement or offer made prior to reaching an agreement. Thus, the trial court erred in admitting evidence of plea negotiations in the form of e-mails exchanged between the parties.
 

 Nevertheless, even when read in the light most favorable to the defendant, the e-mails in the record merely show that negotiations were primarily between defense counsel and Fidelity and that the terms agreed to by Fidelity and the defendant were not ultimately accepted by the State. The record, including the erroneously admitted e-mails, do not reflect, as
 
 *304
 
 the trial court found, that the State was in “complete accord” with the concept that Fidelity’s need for restitution greatly outweighed the need for imprisonment, nor the argument that the defendant and his counsel justifiably relied upon the State’s representations that the case would resolve without additional jail time being imposed.
 

 The record contains the transcript of a status hearing conducted on August 7, 2007, which clearly reflects that almost two years after the defendant’s arrest, no agreement had been reached on the case and that the State was seeking prison time. In response to the trial court’s inquiry on the status of the case and whether the parties could resolve the case, defense counsel responded as follows:
 

 Well, typically the alleged victim would like to have their money. We think we can apiece [sic] that aspect. The State on the other hand would like to have blood. We don’t know if we can apiece [sic] the State on that. They want prison time. If we can resolve this case, we will know pretty soon. I would suspect we will know in two weeks.
 

 (Emphasis added). Based upon this representation, the trial court left the case on its September 12, 2007 “sounding” calendar and September 24, 2007 trial calendar.
 

 The August 8, 2007 e-mail generated the following day was sent by defense counsel to counsel for Fidelity and states that the prosecutor assigned to the case agreed to allow defense counsel and counsel for Fidelity to work towards a possible resolution of the criminal and civil cases, and if they were able to agree on a possible resolution, they would schedule a meeting with the prosecutor to see if the criminal case could be worked out. In the e-mail, defense counsel outlined his proposed resolution of the two cases.
 

 The subsequent e-mails between counsel for the defendant and Fidelity reflect their ongoing discussions. Interestingly, counsel for Fidelity cautions counsel for the defendant that their plea discussions are “privileged and can not be used in any state, federal, civil or criminal, discovery, pre-trial, trial, or appellate proceeding for any purpose.”
 

 At the September 12, 2007 “sounding,” when asked about the status of the case, defense counsel informed the trial court that while he and Fidelity’s counsel appeared to be in agreement, the State’s plea offer was six years incarceration and he was not ready for trial. As detailed earlier, the prosecutor stated that their prior negotiations did not result in a plea offer by the State. The trial court set the case for another status report in thirty days.
 

 On October 12, 2007, the prosecutor reminded the trial court that the State had previously extended a six-year plea offer to the defendant, which did not result in an agreement. The State then informed the trial court that all plea offers were being withdrawn, and the State was withdrawing from further plea negotiations with the defendant. Both counsel for the defendant and Fidelity addressed the trial court, outlined how, by agreement, they proposed to resolve the case, and urged the trial court to accept their negotiated plea. The State objected, told the trial court that the defendant scored 108 years, reminded the trial court that it had withdrawn from plea negotiations, and argued that if the trial court imposed a sentence below the guidelines, it would be an illegal sentence. The matter was set for the following week for “report re: plea.”
 

 Thus, the record in this case, including the inadmissible e-mails, reflects that even as late as August 7, 2007, it was clear that the State was seeking prison time to resolve the case. Although discussions continued after the August 7, 2007 hearing,
 
 *305
 
 the State made it clear on October 12, 2007, that no agreement had been reached and it was withdrawing from further negotiations with the defendant. The defendant’s claim, and the trial court’s finding of justifiable reliance is, therefore, unsupported by the record.
 

 Moreover, the attorneys involved in this case were well-aware that suggestions, proposals, and other statements exchanged during plea negotiations are not binding until the parties finalize their bargain, which without question, did not occur in this case. Accordingly, the trial court’s finding that the defendant justifiably relied upon certain representations made by the State during the negotiation process is devoid of support of any kind.
 

 CONCLUSION
 

 The two statutory grounds for a downward departure provided by the trial court are simply not supported by the record. The crimes involved in this case were highly sophisticated, not isolated, and the corporate victim in this case showed a mere business preference, not a need, for restitution. The record basis for the trial court’s finding that the defendant justifiably relied upon the State’s position during plea negotiations consisted of a series of wholly inadmissible e-mail messages exchanged between the parties, and the content of those messages, even if properly considered, does not evidence justifiable reliance.
 

 Therefore, we hold that the downward departure sentence imposed in this case is not factually justified. We remand for the entry of a guidelines sentence, or in the alternative, the withdrawal of the defendant’s plea.
 

 Reversed.
 

 [1]
 

 . We need not reach, the second prong of the analysis — whether the trial court should have departed from the sentencing guidelines.
 
 See Banks v. State,
 
 732 So.2d 1065, 1068 (Fla. 1999).
 

 [2]
 

 . We also note that Fidelity was apparently willing to "excuse” roughly $200,000 of the $997,654.28 stolen by the defendant (the defendant allegedly took $997,654.28, he returned $200,000, and under the terms of the plea, he is only required to pay an additional $550,000 in restitution). Thus, it appears that Fidelity was willing to absorb a loss of $200,000, and this willingness to excuse repayment militates against a finding of Fidelity’s pressing need for recovery of its losses.
 

 [3]
 

 . We pause here to emphasize this Court’s concern with what appears to be the thrust of the defendant’s argument, as accepted by the trial court — that where a thief has the ability to make his victim monetarily whole, the thief’s punishment ought to be primarily limited to repaying the victim. While this record certainly does not establish that the defendant has such an ability, the law does not excuse the consequences of a theft based solely upon the strength of the thief’s financial portfolio.